(86 App. Div. 33.)

DONNELLY v. McARDLE.

(Supreme Court, Appellate Division, First Department. July 7, 1903.)

1. ABSOLUTE BILL OF SALE AS MORTGAGE—EVIDENCE—SUFFICIENCY.

In a suit to have a bill of sale of plaintiff's interest in a firm to defendant adjudged security for the firm's indebtedness to defendant, the evidence considered, and *held* to show that the instrument was given to secure the firm's indebtedness to defendant, and was executed in the form of a bill of sale to give him absolute control of conducting the business in case of the firm's financial embarrassment, or of liquidating the business free from plaintiff's interference.

2. SAME—EVIDENCE—ADMISSIBILITY.

In a suit to have a bill of sale of plaintiff's interest in a firm to defendant declared security for the firm's indebtedness to defendant, evidence showing that the firm was solvent, having assets exceeding the liabilities, so that plaintiff had a substantial interest in the business, is admissible to corroborate plaintiff's statement that the bill of sale was merely intended to secure defendant on account of the firm's indebtedness to him.

Appeal from Special Term, New York County.

Action by Michael Donnelly against Patrick J. McArdle. From a judgment dismissing the complaint on the merits pursuant to a decision made on the trial of the issues at Special Term, plaintiff appeals. Reversed.

The action is brought for the dissolution of a copartnership, for an accounting, and to have a bill of sale of the plaintiff's interest in the firm to the defendant, executed on the 7th day of November, 1889, declared abandoned, rescinded, and adjudged to have been taken as security for the firm's indebtedness to the defendant. On the 27th day of April, 1887, the parties verbally agreed to form a copartnership for the purpose of dealing in scrap iron and similar articles under the firm name of M. Donnelly & Co., and no time was specified for its continuance. The appellant was to manage the business, and give his entire time thereto, while the respondent was to contribute all the capital. The respondent was to receive 6 per cent. interest on the capital invested, and the appellant was to draw $25 a week, and $2 per day, in addition, for expenses. The profits and losses were to be shared and borne equally. The respondent had previously conducted, and thereafter continued, a separate business of the same nature at Buffalo and Albany, and he resided in the latter city. The appellant had conducted a similar business in the city of New York in partnership with one Dempsey. The parties had been friends since 1874, and in 1884 became brothers-in-law, having married sisters, and after that intimate family relations followed. The respondent had considerable property, and states that he went into partnership with the appellant to help him along. The appellant claims that the respondent frequently said that all he wanted out of the business was what he had invested and interest, and respondent admits that to have been his position, but denies having so stated. At the outset the appellant, according to his own evidence, contributed $500, and other sums subsequently; but this is contradicted by the respondent. There was no specific agreement as to the amount of capital the respondent was to invest. He furnished capital from time to time as the necessities of the firm required, and then payments on account of the firm's indebtedness to him were made as the receipts of the

business permitted. The firm had measurably increased its business, which was large and growing at the time in question. The bill of sale recited that the partnership theretofore existing between the parties was thereby dissolved; that the appellant, in consideration of $1, sold and transferred all his interest in the business and assets of the firm; that appellant had contributed no capital or money to the firm; that appellant agreed that Stephen J. McArdle should take charge of the business, and to transfer to him all of the bankbooks, checkbooks, money, drafts, and notes belonging to the firm, and to account to respondent for any money, checks, drafts, or notes belonging to the respondent that might come into his hands. Both parties agree that respondent was dissatisfied with appellant's management of the business in the summer and fall of 1889, and talked with him concerning it every time they met. The appellant testifies, however, that the first mention of the bill of sale was made by the respondent's wife on a visit to his house the day before its execution; that she then said that her husband had sent her down to close up the business; that he was losing money—would lose $20,000—and had lost confidence in appellant; that he said to her in answer to this, "I have not lost confidence in him, and to show that everything is all right in this business, I will sign everything over for one dollar as security until such time as I can sell enough stock to pay him off, let him go to Albany, where he belongs;" that she considered this very fair, and said she would send for her lawyer and respondent to come down and fix the matter up. In his testimony as to what took place at this interview appellant is corroborated by the testimony of his wife and niece. The appellant further testifies that the next morning the respondent's son, Stephen McArdle, mentioned in the bill of sale, then 17 years of age, and Mr. Kelly, a member of the Albany bar, came to his place of business, and said they were sent by the respondent; that the son informed him the respondent was going to give him another chance; that appellant referred them to the respondent's wife, who was stopping at his house, saying that she would tell them what he was going to do to satisfy the respondent; that they departed, and returned in about an hour, and arranged to go to the law office of McCall & Arnold, at No. 38 Park Row, where he signed the bill of sale in triplicate without reading it or having it read to him at the time, he then supposing it was the security he had offered to give; that Mr. Kelly commenced to read it to him, but he stated that was unnecessary; and that his own attorneys were in the same building, but he did not consult them. The respondent claims that the bill of sale was intended to be absolute, and testifies that he, not his wife, first spoke to the appellant concerning it three days before its execution; that he had complained to appellant that the business was in an insolvent condition, and that he could not afford to let his money remain in this losing business, as he had a large family, and could use the money to better advantage in Albany; and that at this interview, three days before the execution of the bill of sale, he said to appellant that he wished to close out the business, as he was losing money there all the time, and wanted a bill of sale of everything he had, which the plaintiff agreed to give; that on his return to Albany he instructed his attorney to draw papers so the business would be turned over to him so that he would have full possession in case of any trouble; that nothing was said about the instrument being intended as security, and after its execution appellant's connection with the business was that of a clerk at a salary of $25 a week and $2 a day for expenses, which is the same as it had been before. The respondent's wife admits the visit to appellant's house at the time specified, but denies the conversation attributed to her, and claims she had nothing to do with the giving of the bill of sale; but her evidence is conflicting, and she admits having talked with appellant at that time about giving her husband a bill of sale and some paper as security. The attorney testifies that he informed appellant that respondent "was dissatisfied with the way the business was being conducted, and he had said they had lost money from the day they had started in business up to that date, the 7th of November, and he wanted a dissolution and transfer of the business," to which appellant replied, "All right"; that he then went to the law office mentioned, prepared the papers, and notified appellant, who came and signed them in

triplicate, and was paid $1. The respondent's son corroborates the attorney, but says appellant's reply was, "If McArdle is dissatisfied with the management, I am satisfied to dissolve the copartnership." Both the attorney and the respondent's son deny that they had any interview with the respondent's wife prior to the execution of the bill of sale. She denies any conversation with them upon that subject, but admits that they called upon her that morning.

After the execution of the bill of sale, the appellant, the respondent's son, and the attorney visited the People's Bank, where the firm had an account. The appellant's evidence is not clear as to what took place there, but the attorney and respondent's son say that an official of the bank was informed of the dissolution of the firm, and shown the bill of sale, and that the account was changed to respondent's name. They also visited the Columbia Bank, where the firm had an account. The appellant says the transaction there consisted in leaving a power of attorney authorizing respondent's son to draw checks, and he supposed that the firm account had been transferred to respondent's name. The attorney and respondent's son say the bill of sale was also exhibited there. A representative of the bank testified, however, that the account was not changed, but was continued in the firm name, and a power of attorney authorizing the respondent's son to draw checks was subsequently filed; and this is not controverted. No firm checks were drawn by appellant for six weeks thereafter, and all checks in the firm business during that time were drawn by respondent's son, who came to New York to represent his father, and resided with appellant. It appears without substantial controversy, however, that with these exceptions the business was in the main conducted and managed by appellant the same after as before the execution of the bill of sale. He testified that on the day after the execution of the bill of sale he met respondent at the Grand Central Station, and, after some friendly general talk about the execution of the papers the day before, respondent asked him if he needed any money, to which he replied that he could use a little, and then respondent said, "You make out a note for whatever you want, and I will give you a check for it," and respondent gave him a personal check on an Albany bank for $614.19 to the order of the firm, for which appellant handed him a note made in the firm name. The appellant indorsed the firm name on the check, which also bears the indorsement, "P. J. McArdle, by S. J. McArdle, Atty." The check was deposited to the credit of the firm, and used in the firm business. The respondent does not deny this conversation. It appears that some five or six weeks thereafter the parties met again at the Grand Central Station, and appellant's version of the conversation which then ensued between them is as follows: "He came out to me, and he said, 'Donnelly, go over and draw me $500 out of the Columbia Bank.' I said, 'I did not sign any checks since I signed that security paper for you.' He said, 'That is all right; the account is changed to your name.' I said, 'No, it is not.' He said, 'I changed it back against the next day; go right on and draw me $500.' I went over and made out a check to the order of M. Donnelly & Co., and got $500 in cash in bills, and went over to McArdle at the Grand Central Depot, and gave it him." The respondent says concerning this, "There was no such conversation at all." After this, and for about nine months, the respondent's son and the appellant both drew checks on the firm account, and then the former returned to Albany, and the appellant alone subsequently drew the checks. The appellant continued to manage and conduct the business until the 18th day of March, 1891, when respondent took exclusive charge, and excluded him therefrom, and on the following day published a notice to the effect that the copartnership that had theretofore existed between him and the appellant was dissolved. The appellant testifies that the day before he was excluded from the business respondent was displeased with his refusal to purchase a quantity of steel, the purchase of which was strenuously advised by respondent, and charged him with having said that he was going to pay respondent off the 1st of the month; and that respondent thereupon at first insisted upon his paying him off then, or next morning, but later instead took possession as stated. The respondent denies appellant's version of what took place at this time, and testifies: "I recollect what took place about the

17th of March, when I terminated the relation that I had with him. I told him I was sick of the business, and would wind it up—close it up at once. That was about the substance of it—that I was sick of the business, and wanted to wind it up. I did not want to continue it any longer, as I was losing money right along, and could not afford it."

It appears without controversy that from the time the bill of sale was executed down to the 18th day of March, 1891, respondent caused his Albany bookkeeper to forward accounts from time to time of the indebtedness of the firm of M. Donnelly & Co. to him, and the bookkeeper of the latter firm made monthly statements to respondent of his account with it. On the 20th day of June, 1890, respondent wrote a letter to one of his customers, in which he referred to appellant's connection with the business as follows: "In regard to Mr. Donnelly and the steel tires I will state to you that since Mr. Donnelly started in business in New York I have never sold a pound of stock for his account to anybody unless he was with me. Now I cannot sell you any stock that is in New York, as I have never done a dollar's worth of business either buying or selling for Mr. Donnelly as he is a very peculiar man, and if I began to do business for the New York House he would think that all the authority was taken out of his hands and would feel very bad about same. You know your brother Mr. Perkin would do no business from your house except from your orders. Now you very well know any time that either Mr. Donnelly or myself have any stock that you want to buy we are only too willing to sell it to you." On the 9th of July, the same year, respondent wrote the same firm a letter in which he said: "Your kind letter of the 7th inst. is received and I will state to you that I am very much surprised at its contents. That is, in the first place you sold me those beams at $18.75 with the proviso that I was to give you a lot of stock from M. Donnelly's yard when you knew I could not do anything in regard to Mr. Donnelly's business." On the 6th day of January, 1891, respondent wrote M. Donnelly & Co. as follows: "Your very kind letter of the 5th inst. is received stating that I can draw on you at 30 days time. I am sorry that you could not help me out. If I got into a tight hole you know I would help you out. What I expected to see this morning in the mail was a nice big check for about $5,000.00. I had to pay about $40,000.00 to one customer and I had to call on all my friends to help me. I expected you to be the first to respond. However some of the others came to my rescue so it is all right. Hoping that this is satisfactory to you I am," etc. On the 3d of March, 1891, he also wrote M. Donnelly & Co. as follows: "I am very much surprised at you Mr. Donnelly that you did not wire me as I requested as I sent you a dispatch so that you would have no bother last night. You know the fix I have been and am in here for money as I explained it to you thoroughly yesterday and showed you how the Central was pushing me. Now kindly wire me on receipt of this letter if you have received any money. If you have I hope you have sent it to me by mail to-night. If you did it is all O. K. and you need not wire me. Trusting that the above is satisfactory and that you will comply with my request I am," etc. The appellant also showed by the testimony of seven witnesses, all of whom appear to have been business men, and appear to have been disinterested, with the possible exception of one, who was related to him, that respondent at different times throughout the period between the execution of the bill of sale and the 18th day of March, 1891, stated to them that the appellant was his partner. These statements were made in many instances to customers, and in all instances in connection with the firm business. This testimony is controverted by respondent, but it is overwhelming, and fairly establishes the fact.

During the year 1889 the firm's indebtedness to respondent was gradually decreased from $35,301.38 on the 1st of April to $31,544.42 on the 1st of November, and on the date of the bill of sale the firm books showed it to be $28,862.14. After that it decreased to $25,175.18 on the 1st of January, 1891, but was increased to $54,754.41 on the 1st of February, 1891, and on March 1, 1901, to $62,737.68. The respondent claims that the firm sustained losses of from $16,000 to $20,000 during the year 1889, and that when he took the bill of sale he intended to close up the business as rapidly as possible, but

that it was necessary to wait for a favorable opportunity to avoid selling at a sacrifice; that it was more convenient to continue the business in the old firm name, and at his request appellant consented to that course; but it is not pretended that any certificate was filed, as required by the copartnership law (chapter 420, p. 560, Laws 1897). It appears, however, that nothing was done towards closing out the business. Purchases were made and the stock was replenished from time to time as usual, and, as appears above, respondent himself contributed largely to the stock after the execution of the bill of sale, and allowed the firm's indebtedness to him to increase more than twofold. During the period after the execution of the bill of sale appellant overdrew his weekly allowance and disbursements the sum of $5,736, and this was charged up to his account on the firm books. The appellant claims that respondent frequently stated, in substance, that all he wanted out of the business was the amount owing to him and interest, and would accept a check therefor at any time. Respondent admits that his object in forming the firm was to enable appellant to make money, and that he would have been satisfied at any time with the amount owing to him and interest, but denies having so stated.

Argued before HATCH, PATTERSON, O'BRIEN, McLAUGH-LIN, and LAUGHLIN, JJ.

Joseph F. Daly, for appellant.
Pierre E. Du Bois, for respondent.

LAUGHLIN, J. The appellant contends that the findings of the learned trial court to the effect that the bill of sale was intended as an absolute transfer of the plaintiff's interest in the business are against the weight of evidence, and that competent material evidence upon that issue was erroneously excluded. The substance of the testimony and evidence which we deem material is stated in the statement of facts. There is also evidence tending to impeach the credibility of the respective parties and of other witnesses, and there are many other items of evidence shedding more or less light on the litigated questions, which cannot be stated within the reasonable bounds of an opinion; but it has all been given due weight. The credibility of the appellant is so shaken by his own cross-examination that we would place but little reliance upon his testimony standing alone. The probabilities of the case, however, support the contention that this instrument was given to secure the firm's indebtedness to respondent, and that it was executed in the form of a bill of sale in order that he would have absolute control of conducting the business in case of the firm's financial embarrassment or of liquidating the business, unhampered by any interference on the part of appellant. The appellant does not seek relief from the bill of sale on the ground of fraud or mistake. He merely claims the right to show, under a doctrine well established, and looked upon with favor by the courts (Horn v. Keteltas, 46 N. Y. 605; Mooney v. Byrne, 163 N. Y. 80, 57 N. E. 163; Barry v. Colville, 129 N. Y. 302, 29 N. E. 307), that, though absolute in form, it was intended as security. No burden of showing fraud or mistake rested upon him. Of course, in so far as the instrument is in conflict with his present claim, he has the burden of adducing evidence satisfactorily explaining how it came to be drawn as an absolute, instead of a conditional, transfer. Although appellant now claims not to have known at the time he signed the instrument that it was an absolute bill of sale, yet this

is no bar to his obtaining relief, the same as if he conceded that it was understood that he was to execute an absolute bill of sale, and that he so intended, but that the agreement was that it was to be held only as security. Surely, if he could obtain relief on this theory by admitting that he knew the bill of sale was absolute, his rights can be no less merely because he claims he never agreed to give an absolute bill of sale, but only to transfer his interest as security for respondent's claim against the firm. The absoluteness of the bill of sale and its recitals are not altogether irreconcilable with appellant's claim that it was intended as security. The recital that the firm was dissolved is the most difficult to harmonize with this theory.

The respondent claims that the appellant's interest was of no value, and that the bill of sale was executed upon that understanding. Appellant claims it was of great value; and, if so, he being in charge of the business, and thoroughly familiar with the assets and liabilities, he knew the fact, and would not likely make a gift of the only property he had to his brother-in-law, who was well to do financially. If the firm had been dissolved, and there was to be an accounting, he suggests that there would be no necessity for a bill of sale as security. On the other hand, if appellant's interest was of no value, and respondent intended, as he represented, to close out the business, there would be no necessity for his taking a bill of sale, and the only office it would serve would be to obviate an accounting or dissolution proceedings. This is scarcely an adequate explanation when it is remembered that he intended to allow the business to be closed out by appellant, who fixed the selling prices, as it was doubtless contemplated that he should. The relations of the parties continued friendly, and it is not probable that in these circumstances there would have been any difficulty over an accounting. The respondent did not assume or agree to pay the debts of the firm. There were no negotiations for a purchase and sale. There was no inventory of stock or examination of books to ascertain the firm's financial condition. It is quite significant also that, according to the testimony of the respondent, there was no express agreement with respect to appellant's continued connection with the firm. If the bill of sale was intended to be absolute, it is not likely that respondent would unnecessarily exact an agreement that his son should take charge of the business. If appellant retained no interest in the business, and it had not been understood that he was to continue in the charge and management thereof as before, except with reference to signing checks, it is highly improbable that he would have been given this general charge, which became as exclusive as ever after the first six weeks. Nor is it probable that the business would have been continued in the firm name, which would have been a violation of law. Pen. Code, §§ 363, 363b. The fact that respondent's confidence was restored soon after taking the bill of sale and placing his son in charge of the finances tends to support appellant's claim that the son was sent here until the condition of the business could be ascertained, and that the bill of sale was given as security. Concededly, the respondent was dissatisfied with appellant's management, and appellant says he was willing to trans-

fer his interest to respondent as security. Whether it was the intention of respondent to take the bill as security pending the dissolution, or, as claimed by appellant, until such time as the firm's indebtedness to him should be discharged, it is not surprising that his attorney, who was admonished to draw up a paper with a view to enabling respondent to have full possession and control in case of any "trouble," as respondent puts it, should prepare an absolute bill of sale, and insert a clause reciting the dissolution of the firm. That would certainly accomplish what he was directed to obtain, and there might be a difference of opinion as to whether anything short of it would. Nor was it strange that appellant, who, owing to friendship and confidence, refrained from consulting his own attorneys, should sign the instrument in that form. The obstacles to be overcome in reconciling the appellant's theory of the case with the bill of sale which he executed are insignificant in comparison with the difficulties encountered in endeavoring to reconcile the respondent's conduct with the bill of sale as an absolute transfer. The continuance of the firm business for nearly a year and a half with appellant in absolute charge, except that he did not draw checks for six weeks, the rendition of accounts by the firm to respondent and by him to it, and the many representations made by him during this period in letters and verbally to customers and others, and his other numerous acts briefly recited in this opinion, cannot be readily accounted for consistently with respondent's absolute individual ownership of the business during that period; and, if that were the fact, it is inconceivable that he should have written the letters to appellant, herein quoted, requesting as a favor from an employé in charge of his own business funds that belonged to himself.

Upon the trial the appellant, for the purpose of corroborating his statement that the bill of sale was merely intended to secure respondent on account of the firm's indebtedness to him, on his main case offered evidence tending to show not only that the firm was solvent, but that the assets exceeded the liabilities in a considerable amount, so that he had a substantial interest in the business. This evidence was objected to and excluded on the ground that the court would not go into an accounting in determining the main issues, and appellant excepted. Subsequently appellant was permitted to show from his personal knowledge and examination of the stock what he thought was the value of the assets, the amount of the firm's indebtedness to the respondent and to others separately and in gross. His evidence tended to show that there was a surplus of assets over indebtedness of $107,947.17. The respondent was permitted to controvert this by the testimony of an expert accountant, who testified to the condition of the firm affairs as shown by its books, from which he assumed that the liabilities exceeded the assets by $7,844.48. It appeared that there were transactions that were not entered in these books at all, and in some instances only the sales of certain commodities were entered, there being no entry of the purchase or of the amount on hand. The expert testified that his calculations were made exclusively from the books, and he deducted 10 per cent. of the stock shown to be on hand by the books, "according to custom, * * * for lost, stolen, and

different things," and computed the price from the average of all the purchases entered on the books for the entire period of the copartnership down to the execution of the bill of sale. The appellant claims that there was other stock on hand in large quantities, not shown by the books, and that the price assumed by the expert was not the current market price at the time of the execution of the bill of sale. He had prepared an estimate from personal examination on November 10 and 11, 1889, which the court excluded under respondent's objection and appellant's exception. On objection interposed by the respondent, the court precluded appellant from testifying as to the market price upon which the value of the stock on hand should be figured, upon the ground that the testimony of the witness should have been exhausted when he was first upon the stand. From the subsequent admission during appellant's case of the general evidence relating to matters concerning which the court had excluded special evidence, it may be that the court intended to change its ruling, and permit appellant to establish the solvency of the firm; but the record contains no other evidence of a change of intention on the part of the court in that regard. Perhaps the appellant should have again offered specific evidence of the assets and liabilities. We think, however, that it was important evidence, and would have materially aided in solving this important question of fact. Whatever the condition of the firm was with reference to solvency or insolvency, the appellant undoubtedly possessed accurate knowledge on the subject. If the firm was insolvent, then, of course, it is not improbable that he would be willing to execute a bill of sale of his interest; but, if the firm were solvent, so that he had a substantial interest in the business, nothing is shown as an inducement for his executing the bill of sale.

It follows that the judgment should be reversed, and a new trial granted, with costs to appellant to abide the event.

O'BRIEN and HATCH, JJ., concur. PATTERSON and McLAUGHLIN, JJ., concur in result.